### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MARYLAND
### (Greenbelt Division)

| | |
|---|---|
| In re:  FPD, LLC,<br><br>Debtor. | CASE NO.:  10-30424 (____)<br>(CHAPTER 11) |
| In re:  Acorn Land, LLC,<br>       Breezewood Homes, LLC,<br>       First Development Group, LLC,<br>       MD Homes, LLC,<br>       NC Homes, LLC,<br>       Tidewater Land, LLC,<br><br>Debtors.[1] | Case No.:  10-30437 (____)<br>Case No.:  10-30441 (____)<br>Case No.:  10-30443 (____)<br>Case No.:  10-30444 (____)<br>Case No.:  10-30445 (____)<br>Case No.:  10-30446 (____)<br><br>(Joint Administration Requested) |

### DEBTORS' MOTION FOR AN ORDER (A) AUTHORIZING THE DEBTORS' INTERIM AND FINAL USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 361, 363 AND 552, (B) GRANTING ADEQUATE PROTECTION, AND (C) SCHEDULING FINAL HEARING PURSUANT TO 11 U.S.C. § 363(c)(2) AND FED. R. BANKR. P. 4001

The above-captioned debtors and debtors in possession (the "Debtors"), by and through their undersigned proposed counsel, hereby submit this motion (the "Motion") for entry of Orders pursuant to 11 U.S.C. §§ 361, 363 and 552 of title 11 of the United States Code, 11 U.S.C. §§101 et seq. (the "Bankruptcy Code") (A) authorizing the Debtors' interim and final use of cash collateral in which an interest is held by Wells Fargo Bank, N.A., successor to Wachovia Bank, N.A. ("Wells Fargo"), and Manufacturers & Traders Trust Company, successor to Provident Bank ("M&T") (together, the "Lenders"), (B) providing adequate protection to the interests of the Lenders and any other purported secured party, and (C) scheduling a final hearing on the Debtors' Motion pursuant to 11 U.S.C. § 363(c)(2) and Federal Rule of Bankruptcy

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FPD, LLC (0816), Acorn Land, LLC (2720), Breezewood Homes, LLC (1192), First Development Group, LLC (4537), MD Homes, LLC (2723), NC Homes, LLC, (6954), and Tidewater Land, LLC (1753).

Procedure 4001.  In support of this Motion, the Debtors rely on the Affidavit of James W.

Thomasson, Jr. in support of First-Day Motions (the "Thomasson Affidavit"), and state as

follows:

## Introduction

1.      The Debtors in these cases are separate and distinct companies that provide a

variety of services including the acquisition of real estate, the development of land, and the

construction of homes.  Together they comprise a home building and real estate services

enterprise with approximately 40 employees and operations in Maryland, Delaware and North

Carolina.  As set forth more fully below and in the Thomasson Affidavit, the Debtors design,

build and sell single family homes, townhouses, twin houses, and entire residential

communities.  In certain situations, the Debtors may sell parcels or finished lots to other builders

or developers.

2.      The Debtors, like virtually all businesses facing financial distress, did not want to

be here.  In the Debtors' circumstances, however, filing for relief under chapter 11 of the

Bankruptcy Code was the only way the Debtors can protect the families who purchased homes

from the Debtors, and maximize the value of the Debtors' assets for the benefit of creditors.

3.      The thrust of the Debtors efforts in the initial stages of these chapter 11 cases will

be to complete the construction of homes under contract to deliver to their current customers.

To succeed, the Debtors require the approval of this Motion in order to use the Lender's cash

collateral to fund ordinary and necessary day-to-day operations, as well as the Motion for Entry

of Interim and Final Orders Authorizing Debtors to (A) Honor Existing Prepetition Contracts for

the Sale of Homes, Apply Purchaser Deposits, Pay Expenses as Incurred at Closing Free and

Clear of All Liens, Claims and Interests, and (B) Enter into Sale Contracts for Homes and Close

on Sales of Homes Postpetition, in the Ordinary Course of Business (the "Sale Motion").

4.     The Order approving the Sale Motion is necessary to deliver homes to customers because, although such sales are in the ordinary course of business, an Order is required to provide customers with assurance that the Debtors have the right to close on such sales, and for the title insurance companies to be assured of good title.  The subcontractors also need assurances that they will be paid by the Debtors in order for them to remain on the job and finish the work.

5.     Without approval of these two motions, the Debtors will not have the cash required to complete homes currently under construction, or be able to close on the sales of such homes, to the detriment of the Debtors' customers, creditors, and estates.

## Jurisdiction and Venue

6.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(A), and (M) and (O).

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

8.     The statutory bases for relief are Sections 361, 363 and 552 of the Bankruptcy Code, and Rules 4001 and 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Preliminary Statement

9.     The Debtors' businesses historically have been funded by a combination of advances under credit facilities from the Debtors' secured lenders, and revenues from the sale of existing residences and related assets, which comprise part of the Lenders' prepetition collateral. The lenders' interests under such prepetition credit facilities are secured by liens on substantially all of the Debtors' respective properties and assets

10.     Prior to the commencement of these cases, the Debtors' Lenders ceased making any further advances, and the primary lender, Wells Fargo (successor to Wachovia Bank, N.A.)

48392/0001-6965759v6

increased its requirements for payments upon the sale of homes.  These circumstances left the Debtors without sufficient liquidity to continue their operations, requiring the filing of the Debtors' voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

11.     During these cases, the Debtors require the use of cash which may comprise cash collateral within the meaning of § 363(a) of the Bankruptcy Code (the "Cash Collateral"), to fund day-to-day operations to maintain and preserve the value of the Debtors' assets, including completion of construction of partially built homes, and to sell such assets for the benefit of their customers,  creditors, and estates, including the Lenders.

12.     The Debtors seek the interim use of Cash Collateral, including cash on hand as well as proceeds from sales of prepetition collateral during the Interim Period unless sooner terminated under the terms of the proposed interim cash collateral order filed with the Motion or such other Order to which the Debtors and Lenders may agree (the "Interim Order(s)"), in accordance with the Budget and on the terms set forth in the Interim Order.  A copy of the Budget is attached hereto as Exhibit A.  The Debtors seek entry of separate Interim Orders for Wells Fargo and M&T.  The Debtors' use of Cash Collateral will be governed by the Budget and will be used mainly to preserve and maintain the value of the Debtors' assets for the benefit of the Debtors' estates and creditors, including the Lenders.

13.     As additional adequate protection, among other things, the Debtors (i) propose to provide continued financial and other reporting to the Lenders substantially in accordance with the prepetition credit facilities, and (ii) request that the Court grant the Lenders replacement liens on substantially all of their postpetition property and assets, as well as superpriority administrative claims, but solely to the extent of any net diminution of the Lenders' interests in the prepetition collateral resulting from (a) the use of Cash Collateral; (b) the use, sale or lease

4

of any other prepetition collateral; or (c) the imposition of the automatic stay.  The Debtors

respectfully submit that the foregoing adequately protects the Lenders for the use of Cash

Collateral during the Interim Period.

14.     As more fully set forth in the Thomasson Affidavit, the ability of the Debtors to

finance their operations and the availability to them of sufficient working capital and liquidity is

vital to their ability to preserve their assets and maintain their operations.  The Debtors require

access to cash to maintain and preserve and to complete the construction of the homes for which

purchasers are relying on the Debtors to deliver completed homes at closing.  If the Debtors are

unable to use Cash Collateral for such purposes, the recoveries for all creditors, including the

Lenders, would be greatly reduced since, under a "shut-down" scenario, the value of the

Debtors' estates would decline dramatically.  Entry of the Interim Orders are thus (i) critical to

the Debtors' ability to maximize value for their creditors, (ii) in the best interests of the Debtors

and their estates, and (iii) necessary to avoid immediate and irreparable harm to the Debtors,

their customers, their creditors, and their assets, businesses, goodwill, reputation and employees.

### Summary of Relief Requested Pursuant to Bankruptcy Rule 4001(b)

15.     Without the use of the Lenders' cash collateral, the Debtors will be unable to pay

their ordinary and necessary overhead expenses, including but not limited to payroll and related

obligations, taxes, insurance, utilities, subcontractors, bond renewals, amounts required to

purchase supplies for the completion and construction of new homes, and closing costs.  As a

result, the Debtors' operations would cease, precluding the delivery of finished homes to

customers, and causing the Debtors' estates to suffer immediate and irreparable harm.

16.     To preserve the Debtors' businesses and assets for the benefit of the Debtors'

creditors and the estates, the Debtors require interim and final approval for their use of the

Lenders' cash collateral in accordance with the Budget and the proposed Interim Order.

17.     Pursuant to Rule 4001(b) of the Bankruptcy Rules, the relief requested in this

Motion, and the relevant location within the Motion, and proposed interim cash collateral order,

are as follows:

(i)     <u>Name of Each Entity with Interest in Cash Collateral</u>.  Wells Fargo and  M&T .
         Motion at 1, 10.

(ii)    <u>Use of Cash Collateral</u>.  The Debtors propose to use Cash Collateral (defined
         below) for the purposes set forth in the Budget.  The Debtors will provide the
         Lenders weekly reports for the prior week of receipts and disbursements, and a
         reconciliation of actual expenditures and disbursements with those set forth in the
         Budget, showing any variance to each week's aggregate expenditures.  Motion at
         4, 13-14; Interim Order, ¶ 2 and attached Budget.

         The Budget provides for payment of postpetition operating expenses and expenses
         for administration of the cases, including costs and expenses necessary to
         preserve, maintain and sell prepetition collateral, other overhead and expenses
         with respect to the Debtors' day-to-day operations, professional fees and
         expenses, and fees of the United States Trustee pursuant to 28 U.S.C. § 1930.
         Motion at 13-14; Interim Order, ¶ 2 and attached Budget.

(iii)   <u>Material Terms, Including Duration</u>.  The Debtors' use of Cash Collateral will be
         limited to the expenses of day-to-day operations to preserve or enhance the value
         of the collateral including completion of construction of homes due to be
         delivered to customers under contracts.  The duration of the proposed Interim
         Order is for the later of fifteen (15) days from the Petition Date or the conclusion
         of the final hearing and entry of the Final Order approving the Motion (the
         "Interim Period").  Motion at 5; Interim Order, ¶ 2.

(iv)    <u>Adequate Protection</u>.  The Debtors propose to provide the Lenders with adequate
         protection as follows:  (a) a replacement security interest in and lien on all of the
         existing collateral to the extent of any diminution of the Lenders' Cash Collateral;
         (b) a superpriority claim in the amount of the adequate protection obligations to
         the extent provided in Section 507(b) of the Bankruptcy Code; (c) during the
         Interim Period, the Debtors will limit their use of cash pursuant to the Budget; and
         (d) financial reporting to the Lenders.   Motion at 13-18; Interim Order, ¶ 3.

## Background

18.     On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for

relief pursuant to chapter 11 of the Bankruptcy Code.

48392/0001-6965759v6

19.     The Debtors continue to manage and operate their businesses and affairs as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

20.     No trustee, examiner, or official committee of unsecured creditors has been appointed in the cases.

A.     **Overview of the Debtors' Business Operations**

21.     MD Homes, LLC ("MD Homes") is a limited liability company formed under the laws of the State of Maryland engaged in the business of building residential homes.  MD Homes and its affiliated Debtors, over the years, established themselves as one of the Mid-Atlantic region's top residential construction companies, which at its peak ranked among the top 125 home-building companies in the nation.  MD Homes builds single family homes, townhouses and condominiums, with a focus on the first-time home buyer market and certain developments at the higher end of the market.

22.     The growth of the Debtors' businesses accelerated when they expanded into the Raleigh/Durham, North Carolina market in 2001.  By 2005, the companies expanded into the Delaware market and sales increased to over 300 homes with total sales in excess of $50 million in three states.  MD Homes maintained over 70 employees at the height of its success.  Even in 2009, when the housing market was struggling to recover, the Debtors generated revenues for the year in the amount of approximately $35.3 million.

23.     The Debtors received numerous awards in the homebuilding industry, for the quality of their homes, including:  (a) 2010 Builder of Integrity Award - *Quality Builders Warranty Corporation*; (b)  Millennium Award for Excellence in Customer Service - *Quality Builders Warranty Corporation;* (c) Maryland Award of Excellence Outstanding Home - *Home Builders Association of Maryland Sales and Marketing Council;* (d)  Silver Merit Award of Excellence - *Home Builders Association of Maryland Sales and Marketing Council;* and (e)

7

2004 Parade of Homes' Bronze Award - *Home Builders Association of Raleigh - Wake County NC.*

24.     During the previous five years, the Debtors built approximately 1,193 homes throughout the Mid-Atlantic Region

25.     FPD, LLC ("FPD") is a land development company formed to acquire and develop property in Calvert County, Maryland.  Organized in 2002 as a Maryland limited liability company, FPD has developed a premier community named Oak Tree Landing in Prince Frederick, Maryland consisting of over 150 lots.

26.     First Development Group, LLC ("FDG") is a land development company historically focused on acquiring and developing raw ground in growth areas.  FDG has grown from managing one development to several communities and controlling over 500 lots.  FDG produces finished lots ready for the homebuilder to sell, build and deliver to new homebuyers.

27.     Acorn Land, LLC ("Acorn") purchases land and contracts with builders to build homes for sale to new homebuyers.  Acorn's main target market is the first-time home buyer in Maryland and Delaware.  Acorn also has extensive experience in other market segments such as luxury single family homes and age-targeted homes.

28.     Tidewater Land, LLC ("Tidewater") purchases land and contracts with builders to build homes for sale to new homebuyers.  Tidewater's main target market is the first-time home buyer in the Raleigh, North Carolina market.

29.     Breezewood Homes, LLC ("Breezewood") is a limited liability company formed under the laws of North Carolina, which acquired land in the Breezewood community located in Raleigh, North Carolina.  It contracts with a builder to build homes for sale to new homebuyers in the Breezewood community.

30.     NC Homes, LLC ("NC Homes") is a limited liability company formed under the laws of North Carolina.  NC Homes provides residential construction services to landowners/builders for a fee in the greater Raleigh/Durham area.

31.     A more detailed description of the Debtors' business and the facts precipitating the filing of the Debtors' bankruptcy cases are set forth in the Thomasson Affidavit.  Those facts are incorporated herein by reference.

**B.      Prepetition Credit Facilities**

**(i)      Wells Fargo Loans**

32.     Prior to the Petition Date, the Debtors were parties to the following loans with Wells Fargo Bank, N.A., as successor-by-merger to Wachovia Bank, National Association:

(A)     A $36,200,000 Acquisition and Construction Loan, and Revolving Line of Credit, with The Lending Group, LLC ("TLG"), an affiliated non-Debtor, as borrower, and the Debtors as guarantors (the "Wells Fargo Borrowing Base Loan").  The Debtors own the real estate for the projects and secured their guaranty obligations to Wells Fargo through indemnity deeds of trust ("IDOTs") for their real estate.  The Wells Fargo Borrowing Base Loan has been modified and amended over time.  The Debtors, and certain affiliated non-Debtors, used the proceeds of the Wells Fargo Borrowing Base Loan for the acquisition of land and construction costs of their collective communities (including the Breezewood, Hadden Hall, Kingston at Wakefield Plantation, and Arbor Ridge projects owned by the Debtors).  This credit facility is an asset-based loan, with the ability to borrow based on the borrowing base.  As of August 31, 2010, the outstanding balance of the credit facility was $14,574,238**;**

(B)     An $8,300,000 Revolving Land Acquisition and Development Loan and Promissory Note for the Clearview Meadows project with Debtor FDG as the borrower, and certain Debtors as guarantors (the "Wells Fargo Clearview Loan").  The Wells Fargo Clearview Loan has been modified and amended over time.  The Debtors secured their obligations through a mortgage and/or IDOT on their real estate.  As of August 31, 2010, the outstanding balance of the credit facility was $8,016,499; and

(C)     A $6,000,000 Revolving Land Acquisition and Development Loan for the Oak Tree Landing project with affiliated non-Debtor PCS Borrowing as the borrower, and certain of the Debtors as guarantors (the "Wells Fargo Oak Tree Loan").  The Wells Fargo Oaktree Loan has been modified and

amended over time.  The Debtors secured their obligations through a mortgage and/or IDOT on their real estate.  As of August 31, 2010, the outstanding balance of the credit facility was $3,724,159;

**(ii)** **M&T Loans**

33.    Prior to the Petition Date, one or more of the Debtors guaranteed the following

loans between TLG and M&T:

(A)    A $4,000,000 revolving acquisition and development loan as more particularly described in that certain Development Loan Agreement dated September 19, 2005, as amended (the "Aisquith Farm Development Loan").  The Aisquith Farm Development Loan is guaranteed by, among others, Acorn and its obligations under said guaranty are secured by an IDOT, Security Agreement and Assignment of Contracts, Leases and Rents.  As of September 2, 2010, the outstanding principal balance due under the Aisquith Farm Development Loan was $1,152,500, plus interest and other fees due and payable under the loan agreements;

(B)    A $6,900,000 revolving acquisition and development loan as more particularly described in that certain Development Loan Agreement dated October 23, 2003, as amended (the "Wood Creek Development Loan"). The Wood Creek Development Loan is guaranteed by, among others, FDG, and non-Debtors Pool House, LLC ("Pool House") and Club House, LLC ("Club House", and together with FDG and Pool House, collectively, the "Landowners") and the Landowners' obligations under said guaranty are secured by an IDOT, Security Agreement and Assignment of Contracts, Leases and Rents.  As of September 2, 2010, the outstanding principal balance of the Wood Creek Development Loan was $5,804,461.21, plus interest and other fees due and payable under the loan agreements;

(C)    A $5,500,000 revolving construction loan as more particularly described in that certain Construction Loan Agreement dated November 15, 2004, as amended (the "Construction Loan").  The Construction Loan is guaranteed by, among others, Acorn, FDG and MD Homes and said guarantors' obligations are secured by (i) an IDOT, Security Agreement and Assignment of Contracts, Leases and Rents dated November 15, 2004; (ii) an Indemnity Second Deed of Trust, Security Agreement and Assignment of Contracts, Leases and Rents; (iii) an IDOT, Security Agreement and Assignment of Contracts, Leases and Rents dated December 20, 2005, as amended; and (iv) an IDOT, Security Agreement and Assignment of Contracts, Leases and Rents dated as of December 31, 2007.  As of September 2, 2010, the outstanding principal balance of the Construction Loan was $2,517,470.65, plus interest and other fees due and payable under the loan agreements.

(D)     A $604,125 term loan as more particularly described in that certain Promissory Note dated August 16, 2007 (the "Severn Hollow Loan"). The Severn Hollow Loan is guaranteed by, among others, Acorn and Acorn's obligations under said guaranty are secured by an IDOT, Security Agreement and Assignment of Contracts, Leases and Rents. As of September 2, 2010, the outstanding principal balance due under the Reece Road Land Loan was $604,125, plus interest and other fees due and payable under the loan agreements.

(E)     A $2,624,000 term loan as more particularly described in that certain Promissory Note dated December 31, 2007 (the "Douglas Landing Loan"). The Douglas Landing Loan is guaranteed by, among others, Acorn and Acorn's obligations under said guaranty are secured by an IDOT, Security Agreement and Assignment of Contracts, Leases and Rents. As of September 2, 2010, the outstanding principal balance of the Douglas Landing Development Loan was $1,407,999.04, plus interest and other fees due and payable under the loan agreements.

34.     By this Motion, the Debtors are seeking to fund their operations through the use of Cash Collateral, as it is collected, rather than by requests for advances under the Lenders' loan facilities. Accordingly, the Debtors seek to use the proceeds from the sale of homes as the funds flow into FDG, Acorn, Breezewood and Tidewater's operating accounts, and then into the MD Homes and NC Homes accounts at the Bank Annapolis.

C.     **Events Leading to the Bankruptcy**

35.     As is now well documented, after the U.S. housing market peaked in 2005, the market collapsed at the end of 2006. Home foreclosures skyrocketed in 2006-2007, further contributing to the crisis in the subprime, mortgage, and credit markets. The downturn worsened in 2008.

36.     Homebuilders all over the country suffered major losses. A number of them filed for relief in bankruptcy, and many others ceased operating and closed their doors.

37.     According to the National Association of Homebuilders (the "NAH"), single-family home starts fell by 3.3% in October 2008 to a level that was down by 71% from its peak in January 2006. The NAH also reported that sales of new homes continued to trend downward

11

falling by 40% on a year-over-year basis. New-home sales were down by 69% in 2008 from their cyclical peak in July 2005. On December 30, 2008, the Case-Shiller home price index reported its largest price drop in its history, and the housing market has yet to recover.

38.     Like most in the homebuilding industry, the Debtors began to suffer losses as the decline in the market continued. As property values continued to fall, pressure from Wells Fargo accelerated with demands for curtailments on loans, reducing loan limits, acceleration of pay down on loans, and other adverse actions. The Debtors managed through the downturn for several years by taking actions to reduce overhead and reduce debt. The Debtors reduced their staff from 70 employees to approximately 40 as of the Petition Date, cut salaries and benefits, and reduced overhead and direct costs.

39.     Finally, Wells Fargo stopped funding and demanded payment in full of its loans, while insisting on taking all net proceeds of the sale of houses on which it held liens, leaving the Debtors with insufficient cash to continue to operate their businesses. In these circumstances, the Debtors were forced to seek relief under chapter 11 of the Bankruptcy Code in order to preserve the value of their assets, to protect their customers, and to sustain their business operations.

**Relief Requested and Grounds Therefor**

40.     The standards governing a debtor's use of cash collateral are set forth in Section 363(c)(2) of the Bankruptcy Code, which provides:

> The trustee [or debtor-in-possession] may not use, sell, or lease
> cash collateral under paragraph 1 of this subsection, unless -
>
> (A) each entity that has an interest in such cash collateral consents;
> or
>
> (B) the court, after notice and a hearing, authorizes such use, sale,
> or lease in accordance with the provisions of this section.

48392/0001-6965759v6

11 U.S.C. § 363(c)(2).

41.     The "provisions of this section" referenced in Section 363(c)(2) include Section

363(e), which provides:

> Notwithstanding any other provision of this section, at any time, on
> request of an entity that has an interest in property used, sold, or
> leased, or proposed to be used, sold, or leased, by the trustee, the
> court, with or without a hearing, shall prohibit or condition such
> use, sale or lease as is necessary to provide adequate protection of
> such interest.

11 U.S.C. § 363(e).  The Debtors respectfully submit that the proposed use of Cash Collateral is

necessary to preserve their assets and property during the cases and will avoid immediate and

irreparable harm to the Debtors' estates and creditors, including the Lenders.  Specifically, the

Debtors require the use of the Cash Collateral to do the work necessary to be ready to go to

closings on the sale of homes, and to use a portion of the sale proceeds to pay the Debtors'

necessary expenses while making substantial payments to the Lenders.  As set forth below, the

Lenders' interests are adequately protected through, among other things: (a) budgetary

constraints which allow spending on day-to-day operations which preserve or enhance the value

of the collateral, (b) financial reporting consistent with the Lenders' prepetition credit facilities,

(c) a replacement lien on the Debtors' postpetition assets, and (d) an administrative expense

claim to the extent the Debtors' use of cash collateral results in a diminution of the value of the

Lenders' collateral.  Accordingly, the use of Cash Collateral directly benefits the estates and

creditors by enhancing the prospects of a successful outcome of these cases.

**A.     The Budgetary Constraints on the Debtors' Use of Cash Collateral Adequately
        Protect the Interests of the Lenders.**

42.     The Budget provides for expenditures to fund the Debtors' reduced, but necessary

and essential day-to-day operations, which for the foreseeable future are primarily geared

towards the completion, preservation, and sale of 8 homes over the next 30 days which are

48392/0001-6965759v6

under contract.  Such expenditures include payroll and payments required to complete construction of homes which can rapidly lose value and even create liability if left unfinished.

43.     Courts have routinely held that adequate protection may be demonstrated by a showing that the going concern value of the debtors, or the value of the lender's collateral, is preserved by the debtor's continuing operations and use of cash collateral.  See, e.g., In re JKL Chevrolet, Inc., 117 F.3d 1413, 1413 (4th Cir. 1997) (allowing use of cash collateral to operate automobile dealership as long as continued operations maintained the value of the business);  In re Snowshoe Co., Inc., 789 F.2d 1085, 1087 (4th Cir. 1986) (allowing use of cash collateral to operate ski resorts where trustee reported that ski resort would lose 50% to 90% of its fair market value if it ceased operating).

44.     Here the cash expenditures are necessary to preserve and maintain the value of the prepetition collateral and the interests of the Lenders.  If the Debtors are precluded from making expenditures necessary to maintain their assets and conduct ongoing sales operations in the ordinary course, or if the Debtors are forced to abruptly shut down their operations, the Lenders and all creditors will be harmed.  See, e.g., In re Aqua Assocs., 123 B.R. 192, 196 (Bank. E.D. Pa. 1991) ("The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.").

45.     As further adequate protection, the Debtors will pay the release prices to the Lenders at the closing of each home that is sold as set forth in the Budget.

**B.      The Lenders Will Receive Replacement Liens and Superpriority Claims.**

46.     Section 361(2) of the Bankruptcy Code provides that adequate protection may be provided by granting a replacement lien in postpetition assets to protect the secured creditor from diminution of its collateral during the bankruptcy case.  Courts have utilized that provision

14

of Section 361 in fashioning adequate protection and permitting a debtor to use cash collateral under similar circumstances.  See, e.g., In re LTV Steel Company, Inc., 274 B.R. 278, 286 (Bankr. N.D. Ohio 2001);  In re Prichard Plaza Associates Limited Partnership, 84 B.R. 289, 302 (Bankr. D. Mass. 1988) ("If the proceeds stream is likely to remain stable through the collection of new accounts receivable or the sale of new inventory, adequate protection is often ensured by a replacement lien on postpetition accounts and inventory and their proceeds and by some provision for monitoring the use of proceeds.");  In re Airport Inn Associates, Ltd., 132 B.R. 951, 960 (Bankr. D. Col. 1990) ("The court could order a lien in postpetition accounts receivable as adequate protection if that relief was requested . . . .");  In re International Design & Display Group, Inc., 154 B.R. 362, 364 (Bankr. S.D. Fla. 1993) (court authorized debtor to use cash collateral and, as adequate protection, granted secured creditor replacement lien on all postpetition accounts receivable, inventory and contracts to the extent the creditor's collateral was depleted).

47.     The proposed Interim Orders provide adequate protection to the Lenders in the form of (i) replacement liens on and security interests in the Debtors' property and assets which the respective lenders had prepetition liens on (whether existing on the Petition Date or acquired or arising thereafter), and proceeds thereof (See 11 U.S.C. § 361(2) (providing replacement liens as a form of adequate protection)); and (ii) allowed superpriority claims pursuant to section 507(b) of the Bankruptcy Code, senior to all other administrative claims, except as set forth below.  Such adequate protection is commonplace.  See, e.g., MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396-98 (10th Cir. 1987) (allowing the debtor to replace a lien on cash with a lien on property); In re Center Wholesale, Inc., 759 F.2d 1440, 1450 (9th Cir. 1985) (observing that a lien on additional property of the debtor would likely constitute

15

adequate protection for the secured creditor).  The replacement liens and superpriority claims
are granted solely to the extent of any net diminution of the value of the Lenders' interests in the
Cash Collateral resulting from the (i) Debtors' use of the Cash Collateral; (ii) the Debtors' use,
sale or lease of any other prepetition collateral; or (iii) the imposition of the automatic stay.  The
adequate protection liens and superpriority claims shall also be junior and subject to all valid,
enforceable, perfected and unavoidable liens on the prepetition collateral in existence as of the
Petition Date or duly perfected after the Petition Date under section 546(b) of the Bankruptcy
Code.

**C.**     **The Interim Orders Require the Debtors to Provide Financial Reporting to the
Lenders Substantially in Accordance with the Prepetition Credit Documents.**

48.     Continued financial and other reporting as required by the proposed Interim
Orders is often a component of the adequate protection provided to secured creditors.  See, e.g.,
In re 5877 Poplar, L.P., 268 B.R. 140, 150 (Bankr. W.D. Tenn. 2001) (finding adequate
protection for use of cash collateral where, among other things, the debtors agreed to provide
operating reports to the lender and permit inspection of the premises upon lender's reasonable
request).  In addition to the Budget, which may be updated from time to time, the Lenders will
continue to receive from the Debtors weekly cash flow reports, showing cash receipts and
disbursements made by the Debtors during the prior week.  Upon appointment of an official
committee of unsecured creditors (the "Committee"), the Debtors will provide the Committee,
or its Chairman until the Committee selects counsel, with the same cash flow reports delivered
to the Lenders.  Upon reasonable notice by the Lenders, the Debtors will also permit the Lenders
and any of their financial advisors reasonable access to the Debtors' management and financial
advisors to discuss and to review the Debtors' cash flows, operating and financial performance,
the Debtors' budgets, forecasts, projections and documents related thereto, including, without

limitation, to review matters related to the existence, condition, location and amount of the Lenders' collateral.

## The Need for Immediate Relief Pending a Final Hearing.

49.     Bankruptcy Rule 400l(b) provides that a final hearing on a motion to use cash collateral may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a Debtors' estates pending a final hearing.

50.     Pursuant to Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an expedited preliminary hearing on this motion and (a) authorize the Debtors to use Cash Collateral on an interim basis in accordance with the Budget, pending entry of a final order, in order to (i) maintain and finance the ongoing operations of the Debtor, and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest, and (b) schedule a hearing to consider entry of a final order.

51.     Unless the Debtors are authorized to use the Lenders' Cash Collateral, the Debtors would be unable to continue to operate their businesses, including meeting payroll and other operating expenses and servicing their customers.  In that event, the Debtors would be deprived of any ability to have a successful chapter 11 case.

52.     Accordingly, the Debtors respectfully submit that entry of an Order authorizing the interim use of cash collateral until entry of final Order approving the Motion, and scheduling a final hearing to approve the use of Cash Collateral is necessary and appropriate, and in the best interest of creditors and the estates.

17

## Notice

53.     Notice of this motion has been provided to: (i) the Office of the United States Trustee for the District of Maryland; (ii) the Debtors' thirty largest unsecured creditors; (iii) counsel to the Debtors' prepetition secured lenders; (iv) Internal Revenue Service; and (v) all parties entitled to receive notices in these chapter 11 cases pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtor submits that no further notice is required.

## Waiver of Memorandum of Law

54.     Pursuant to Local Rule 9013-2 of the Local Rules, the Debtors state that, in lieu of submitting a memorandum in support of this Motion, they will rely solely upon the grounds and authorities set forth herein.

## No Prior Request

55.     No prior request for the relief sought on this Motion has been made to this or any other Court.

## Conclusion

WHEREFORE, the Debtors respectfully request the Court to (A) enter the Interim Orders granting the relief requested herein, including (i) authorizing the Debtors' use of cash including Cash Collateral, pursuant to the terms of the Interim Orders (including the Budget), (ii) finding that the interests of the Lenders and any other purported secured creditors are adequately protected, and (iii) granting related relief, and (B) schedule an interim hearing and a final hearing; and (C) grant to the Debtors such other and further relief as the Court deems just and proper.

48392/0001-6965759v6

18

Dated:  September 3, 2010

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: /s/ Irving E. Walker
Irving E. Walker (Bar No. 00179)
Gary H. Leibowitz (Bar No. 24717)
G. David Dean (Bar No. 26987)
300 E. Lombard Street, Suite 2000
Baltimore,  MD 21202
Tel: (410) 230-0660
Fax: (410) 230-0667

*Proposed counsel for the Debtors and Debtors in Possession*

48392/0001-6965759v6