**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

| | |
|---|---|
| In re:  FPD, LLC, | CASE NO.:  10-30424 (____) |
| Debtor. | (CHAPTER 11) |
| In re:  Acorn Land, LLC, | Case No.:  10-30437 (____) |
| Breezewood Homes, LLC, | Case No.:  10-30441 (____) |
| First Development Group, LLC, | Case No.:  10-30443 (____) |
| MD Homes, LLC, | Case No.:  10-30444 (____) |
| NC Homes, LLC, | Case No:  10-30445 (____) |
| Tidewater Land, LLC, | Case No.:  10-30446 (____) |
| Debtors.[1] | (Joint Administration Requested) |

**AFFIDAVIT OF JAMES W. THOMASSON, JR. IN SUPPORT**
**OF FIRST-DAY MOTIONS**

I, James W. Thomasson, Jr., being duly sworn, deposes and states, under penalty of perjury, that the following information is true to the best of my knowledge, information and belief.

**I.      Background**

**A.      Introduction**

1.      I am the President of MD Homes, LLC ("MD Homes"), FPD, LLC ("FPD"), First Development Group, LLC ("FDG"), Acorn Land, LLC ("Acorn"), Tidewater Land, LLC ("Tidewater"),  Breezewood Homes, LLC ("Breezewood"), and NC Homes, LLC ("NC Homes").  In this capacity, I am familiar with the day-to-day operations, financial condition, books and records, and business affairs of the Debtors (also referred to herein as the

---

[1]      The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number are: FPD, LLC (0816), Acorn Land, LLC (2720), Breezewood Homes, LLC (1192), First Development Group, LLC (4537), MD Homes, LLC (2723), NC Homes, LLC, (6954), and Tidewater Land, LLC (1753).

"Companies").  I submit this Affidavit in support of the Companies' chapter 11 petitions, first-day applications, and motions listed on **Exhibit A** hereto (the "First-Day Motions").

2.      Except as otherwise indicated, all facts set forth in this Affidavit are offered to the best of my knowledge, information and belief and are based upon my personal knowledge, my review of relevant documents, information provided to me by the Companies' management or professionals working with me or under my supervision, or my informed opinion based upon my experience and knowledge of the Companies' industry, operations and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Affidavit on behalf of the Companies.

3.      To minimize any adverse effects on our businesses as a result of the commencement of the Companies' chapter 11 cases, the Companies have requested various types of relief in the First-Day Motions.  The First-Day Motions seek relief, among other things, to:  (a) approve, on an interim basis and final basis, the use of Cash Collateral which is needed to cover day-to-day operating expenses at the onset of these cases; (b) permit the continuation of the Companies' cash management system and other business operations without interruption; (c) continue to honor prepetition contracts for the sale of homes and to sell homes postpetition in the ordinary course of business; (d) maintain employee morale and confidence; and (e) establish certain other administrative procedures to promote a smooth transition into chapter 11.  Gaining and maintaining the support of the Companies' employees, home buyers, subcontractors, vendors and other key constituents as well as maintaining the day-to-day operations of the Companies' businesses with minimal disruption, will be critical to the Companies' efforts in chapter 11 and their ability to maximize the recovery prospects for all interested parties.  The relief requested in

the First-Day Motions is in the best interest of the Companies, their creditors and estates, and is necessary to avoid immediate and irreparable harm.

**B.**    **Overview of the Debtors' Businesses**

4.    Founded in 1981, the Debtors' businesses grew from a small construction service provider in Anne Arundel County, Maryland to an enterprise that, at its peak, had active construction in 11 communities, and annual sales in excess of 300 homes.

5.    MD Homes is a limited liability company formed under the laws of the State of Maryland engaged in the business of building residential homes.  MD Homes and its affiliated Debtors, over the years, established themselves as one of the Mid-Atlantic region's top residential construction companies, which at its peak ranked among the top 125 home-building companies in the nation.  MD Homes builds single family homes, townhouses and condominiums, with a focus on the first-time homebuyer market and certain developments at the higher end of the market.

6.    FPD is a land development company formed to acquire and develop property in Calvert County, Maryland.  Organized in 2002 as a Maryland limited liability company, FPD has developed a premier community named Oak Tree Landing in Prince Frederick, Maryland consisting of over 150 lots.

7.    FDG is a land development company historically focused on acquiring and developing raw ground in growth areas.  FDG has grown from managing one development to several communities and controlling over 500 lots.  FDG produces finished lots ready for the homebuilder to sell, build and deliver to new homebuyers.

8.    Acorn purchases land and contracts with builders to build homes for sale to new homebuyers.  Acorn's main target market is the first-time home buyer in Maryland and

Delaware.  Acorn also has extensive experience in other market segments such as luxury single family homes and age-targeted homes.

9.      Tidewater purchases land and contracts with builders to build homes for sale to new home buyers.  Tidewater's main target market is the first-time home buyer in the Raleigh, North Carolina market.

10.      Breezewood is a limited liability company formed under the laws of North Carolina, which acquired land in the Breezewood community located in Raleigh, North Carolina.  It contracts with a builder to build homes for sale to new homebuyers in the Breezewood community.

11.      NC Homes, LLC is a limited liability company formed under the laws of North Carolina.  NC Homes provides residential construction services to landowners/builders for a fee in the greater Raleigh/Durham area.

**C.      Growth of the Businesses**

12.      The Companies' growth and evolution to become a large regional builder accelerated when it expanded into the Raleigh/Durham, North Carolina market in 2001.  By 2005, the Companies expanded into the Delaware market and sales increased to over 300 homes with total sales in excess of $50 million in three states.  The Companies maintained over 70 employees at the height of their success.  Even in 2009, when the housing market was struggling to recover, the Debtors generated revenues for the year in the amount of approximately $35.3 million.  The Debtors built approximately 1,193 homes throughout the Mid-Atlantic Region since 2005.

13.      The Companies received numerous awards in the homebuilding industry for the quality of their homes, including:  (a) 2010 Builder of Integrity Award - *Quality Builders*

*Warranty Corporation*; (b) Millennium Award for Excellence in Customer Service -*Quality Builders Warranty Corporation;* (c) Maryland Award of Excellence Outstanding Home - *Home Builders Association of Maryland Sales and Marketing Council*; (d) Silver Merit Award of Excellence, *Home Builders Association of Maryland Sales and Marketing Council;* and (e) 2004 Parade of Homes' Bronze Award - *Home Builders Association of Raleigh - Wake County NC.*

14.    The Companies had a very fast sales pace over these growth years, and were continuously turning over their inventory of finished lots. With the rapid pace of the market, finished lots quickly became scarce and in high demand by many builders, especially the national builders.  In order to compete for finished lots in its target market, the Companies began purchasing land to develop for their own use.  The process of entitlement and development was lengthy and capital intensive, but very lucrative once finished lots were able to be delivered.

### D.    Events Leading to Bankruptcy

15.    As is now well documented, after the U.S. housing market peaked in 2005, the market collapsed at the end of 2006.  Home foreclosures skyrocketed in 2006-2007, further contributing to the crisis in the subprime, mortgage, and credit markets.  The downturn worsened in 2008, and real estate lending became nonexistent.

16.    Homebuilders all over the country suffered major losses.  A number of them filed for relief in bankruptcy, and many others simply ceased operating and closed their doors.

17.    According to the National Association of Homebuilders (the "NAH"), single-family home starts fell by 3.3% in October 2008 to a level that was down by 71% from its peak in January 2006.  The NAH also reported that sales of new homes continued to trend downward falling by 40% on a year-over-year basis.  New-home sales were down by 69% in 2008 from

their cyclical peak in July 2005.  On December 30, 2008, the Case-Shiller home price index reported its largest price drop in its history.

18.    The Companies were not immune to these adverse market forces.  Beginning in 2006, as home values declined, so did the volume of home sales.  The Companies' sales dropped from 313 in 2006, to 185 in 2009.  The Companies' inventory of finished lots became low and there were numerous unanticipated delays in the development process of the new communities. The market took its toll on the Companies' ability to carry the debt load required from their raw land positions, and the demand for the non-revenue producing land then became extremely low.

19.    Like most in the homebuilding industry, the Companies began to suffer losses as the decline in the market continued.  As property values continued to fall, pressure from the Companies' major lender, Wells Fargo, N.A. (successor to Wachovia Bank, N.A.) accelerated with demands for curtailments on loans, reducing loan limits, acceleration of pay down on loans, and other adverse actions.  The Companies managed through the downturn for a few years by taking actions to reduce overhead and reduce debt.  The Companies reduced their staff from 70 employees to approximately 40 as of the Petition Date, cut salaries and benefits, and reduced overhead and direct costs.

20.    Finally, Wells Fargo, N.A. stopped funding and demanded payment in full of its loans, while insisting on taking all net proceeds of the sale of houses on which it held liens, leaving the Companies with insufficient cash to continue to operate their businesses.  In these circumstances, the Companies were forced to seek relief under chapter 11 of the Bankruptcy Code in order to preserve the value of their assets, to protect their customers, and to sustain their business operations.

**D.**     **Prepetition Capital Structure**

21.     The Debtors' growth has been very dependent on loans from banks to finance the acquisition of land as well as the construction and sale of homes.  Prior to the Petition Date, the Debtors relied on Wells Fargo Bank, N.A., successor by merger to Wachovia Bank ("Wells Fargo"), and Manufacturers & Traders Trust Company, successor by merger to Provident Bank ("M&T") (together, the "Lenders"), and they had the ability to borrow up to approximately $37 million in the aggregate.  The loans were guaranteed by the Debtors and their owners.

22.     As of August 27, 2010, the Debtors owe their Lenders a total of approximately $29,000,000 under the various loan agreements, and other affiliated non-Debtors owe approximately $14,500,000.

**E.**     **The Need for Use of Cash Collateral**

23.     As reflected in the Debtors' cash flow forecast for the first 30 days of these cases (the "Budget"), the Debtors require use of the Lenders' cash collateral.  Without this immediate postpetition use of cash, the Debtors would be unable to pay their payroll and other operating expenses and would be prevented from delivering houses to their customers and continuing their businesses, thus impairing the Debtors' ability to preserve the value of their estates.  As of the Petition Date, the Debtors have approximately 34 contracts with purchasers to build homes which are in various stages of construction, ranging from not-yet-started to almost completed. Eight houses are scheduled to close in the next 30 days.

24.     The Debtors intend to complete the construction of these homes and to fulfill their contract obligations to their customers.  To do so will require use of cash collateral.

## II.   First-Day Motions[2]

25.     Concurrently with the filing of these chapter 11 cases, the Companies filed a number of First-Day Motions.  The Companies anticipate that the Court will conduct a hearing soon after the commencement of these cases (the "First-Day Hearing"), at which the Court will hear the First-Day Motions.

26.     An important and critical element of the success of these chapter 11 cases will be the entry of orders granting the relief requested in each of the First-Day Motions.  Generally the First-Day Motions are designed to facilitate:  (a) the continuation of the Companies' existing cash management systems and other business operations without interruption, and to approve on an interim basis the use of cash collateral, (b) preservation of customer and vendor relationships, (c) maintenance of employee morale and confidence, and (d) establishment of certain other administrative procedures to promote a smooth transition into chapter 11.  The factual background in support of each First-Day Motion is provided below:

**A.     Debtors' Motion for Order (A) Authorizing the Debtors' Interim and Final Use of Cash Collateral Under 11 U.S.C. § 361, 363, and 552, (B) Granting Adequate Protection, and (C) Scheduling a Final Hearing Pursuant to 11 U.S.C. § 363(c)(2) and Fed.R.Bankr.P. 4001.**

27.     The Companies' businesses historically have been funded by a combination of advances under credit facilities from their Lenders, and revenues from the sale of completed homes.  Prior to the commencement of these cases, the Companies' primary lender ceased making any further advances, and increased its requirements for payments upon the sale of houses.  These circumstances left the Debtors without sufficient liquidity to continue their operations.  During these cases, the Debtors require the use of "cash collateral" as I understand that term (the "Cash Collateral"), to fund day-to-day operations, to maintain and preserve the

---

[2]     Capitalized terms not defined herein have the meanings ascribed to them in the respective First-Day Motions.

value of the Companies' assets, including completion of construction of partially built homes, and to sell such assets, in all cases for the benefit of their customers, estates and creditors, including the Lenders.

28.     The Companies seek the interim use of Cash Collateral, constituting proceeds from sales of prepetition collateral, during the Interim Period unless sooner terminated under the terms of the Interim Order in accordance with a Budget and on the terms set forth in the Interim Order.  The Companies' use of Cash Collateral will be governed by the Budget and will be used to preserve and maintain the value of the Debtors' assets for the benefit of the Debtors' estates and creditors, including the Lenders.

29.     As adequate protection for the Lenders, among other things, the Companies (i) propose to provide continued financial and other reporting to the Lenders substantially in accordance with the prepetition credit facilities, and (ii) request that the Court grant the Lenders replacement liens on substantially all of their postpetition property and assets, as well as superpriority administrative claims, but solely to the extent of any net diminution of the Lenders' interests in the prepetition collateral resulting from (a) the use of Cash Collateral; (b) the use, sale or lease of any other prepetition collateral; or (c) the imposition of the automatic stay.  The Companies believe that this proposed arrangement will adequately protect the Lenders for the use of Cash Collateral during the Interim Period.

30.     If the Companies were unable to use Cash Collateral for such purposes, the recoveries for all creditors, including the Lenders, would be greatly reduced since, under a "fire-sale" scenario, the value of the Debtors' estates would decline dramatically.  Entry of the Interim Order is thus (i) critical to the Companies' ability to maximize value for their creditors, (ii) in the best interests of the Companies and their estates, and (iii) necessary to avoid

immediate and irreparable harm to the Companies, their customers, creditors, and their assets, businesses, goodwill, reputation and employees.

      **B.**    **Motion for Order Authorizing the Debtors to (A) Honor Existing Prepetition Contracts for the Sale of Homes and to Apply Purchaser Deposits and Pay Expenses Incurred at Closing, and (B) Enter into Sale Contracts for Homes and Close on Sales of Homes Postpetition in the Ordinary Course of Business.**

      31.    By this Motion (the "Sale Motion"), the Debtors seek the entry of interim and final Orders: (i) authorizing the Debtors to sell and close on the sale of residential homes and to pay all associated expenses at closing, including but not limited to real estate taxes, subject to the Debtors' compliance with the terms of any Order entered with respect to the Debtors' use of cash collateral; and (ii) with respect to the closings on homes for which any mechanic's lien is filed under applicable state law prior to closing on such homes, authorizing the Debtors to sell and close upon such residential homes free and clear of all liens, claims and encumbrances, including any mechanic's liens, subject to certain protocols with respect to mechanic's lien claims described in detail in the motion (the "Mechanic's Lien Protocols").

      32.    The Debtors currently have approximately 34 residential homes under contract to be constructed (or completed) and sold in Maryland, Delaware, and North Carolina.  Over the next 90 days, the Debtors expects to close on most of these sales.[3]  The purchasers of these homes have each paid significant deposits to be credited to the sale price of the home at closing, and their families are depending on the Debtors to finish the construction and to deliver the homes they purchased within a reasonable period of time.

      33.    The Debtors' primary goal at the outset of these chapter 11 cases is to deliver homes under contract to customers.  The Debtors believe that approval of this Motion and the

---

[3]  The Debtors expect to close on five (5) homes in the next two weeks and eight (8) homes in the next month.

Mechanic's Lien Protocols will allow the Debtors to accomplish this goal, while at the same time protecting the interests of tax claimants (which will be paid in full at settlement), secured lenders (which will receive adequate protection in any interim cash collateral Order entered by this Court in tandem with the relief requested in this Motion), and subcontractors that may have properly filed mechanic's liens under applicable state law.

34.     Because the Debtors do not have the luxury of debtor-in-possession financing at this point in these cases, they will need to rely exclusively on use of cash collateral to fund operations and to pay employees to remain on staff.  Without the relief requested herein, along with authority to use cash collateral, the Debtors believe that they will not be able to operate postpetition and complete the sale of homes under contract, at the expense of customers who are relying on the Debtors to deliver their homes.

35.     Accordingly, it is my belief that granting the Sale Motion is necessary and in the best interest of the Debtors, their creditors, and these bankruptcy estates.

**C.     Motion for Interim and Final Orders Pursuant to Section 366 of the Bankruptcy Code (i) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Services, (ii) Deeming Utility Providers Adequately Assured of Payment for Future Utility Services, and (iii) Establishing Procedures for Determining the Adequate Assurance of Payment**

36.     The Companies seek the entry of an Interim Order and a Final Order, (i) prohibiting utility providers from altering, refusing or discontinuing utility services, (ii) deeming that the Companies' utility providers have been provided with adequate assurance of payment for future services, (iii) establishing procedures for determining the adequate assurance of payment for future services, (iv) authorizing the Debtors' banks to honor any checks received by the Utility Providers prepetition for services which were not cashed as of the Petition Date, or replacement checks for any checks that were dishonored.

37.    In connection with the operation of their businesses in the ordinary course, the Companies obtain Utility Services from a number of Utility Providers, and incur expenses for such services.  Uninterrupted utility services are critical to the Companies' ongoing ability to maintain their offices and model homes, and to construct new homes, and therefore, to the success of these chapter 11 cases.

38.    Generally, the Companies have established a good and consistent payment history with the Utility Providers making regular, timely payments for expenses incurred.  As of September 2, 2010, the Debtors are current with their Utility Providers.

39.    The Companies propose to deposit a sum equal to approximately fifty percent (50%) of their average aggregate monthly payment of Utility Services, into an interest bearing segregated account maintained by the Companies to provide adequate assurance of future performance to the Utility Providers.  They also propose a process for Utility Providers to request further assurance in the event they are not satisfied with the deposit.

   **D.    Debtors' Motion for an Order Authorizing Payment of Prepetition Wages, Compensation, Employee Benefits, Expenses Reimbursements and Related Items, and the Continuation of Certain Employment Policies in the Ordinary Course**

40.    By this Motion, the Debtors respectfully request the entry of an Order authorizing, but not requiring, the Debtors to pay outstanding Prepetition Payroll Obligations, Employee Benefits and Reimbursable Expenses, as well as authority to continue paying and/or otherwise honoring the ordinary employee benefits described above (together, the "Employee Obligations").

**Employee Compensation**

41.　　As of the Petition Date, the Debtors had approximately 40 employees, consisting of corporate office employees, salespeople, and construction-side employees.  All of the Debtors' employees are employed by MD Homes.

42.　　The office employees (with the exception of one or two) are located in the Debtors' Maryland office.  Some office employees are full-time salaried employees, and other office employees are part-time employees paid on an hourly basis.

43.　　The salespeople consist of eight (8) community sales managers and four (4) community sales associates.  Community sales managers are responsible for sales in the Debtors' communities and typically work primarily out of model homes in those communities. Community sales managers receive fixed salaries and bonuses based on a small percentage (approximately 1.25%) of the gross sale price (minus certain expenses) of each home sold in the communities in which they work.  In busier communities, community sales associates are hired to assist the community sales managers in day to day operations in the community.  Community sales associates receive fixed salaries and a fixed bonus for each home sold in the communities in which they work.

44.　　MD Homes also employs two (2) regional sales & marketing managers whose responsibilities include overseeing the sales managers and the sales and marketing efforts in their respective regions.  Regional sales & marketing managers receive fixed salaries and bonuses based on a small percentage (approximately .24%) of the gross sale price (minus certain expenses) of homes sold in their regions.  Bonuses to sales employees typically are paid in the next pay period following settlements.

45.　　With respect to construction-side employees, MD Homes employs approximately six (6) superintendents, whose responsibilities including scheduling subcontractor work,

arranging for and attending inspections and walk-through visits with customers.  Superintendents are paid a fixed salary and are eligible for a quarterly bonus based on the number of homes sold.

46.     In addition to superintendents, MD Homes also employs a warranty manager and punch out assistant (who provides assistance to superintendents).  These employees do not have bonus plans.  The warranty manager is paid a fixed salary and the punch out assistant is paid by the hour.

47.     Because ordinary income is paid one week in arrears and bonuses are based on home sales are paid following settlements, certain wages owed to employees are due and owing on the Petition Date.   As of the Petition Date, the Debtors owe approximately $80,000.00 in outstanding accrued and unpaid wages, all of which comprises salary income ("Prepetition Payroll Obligations").

## Payroll Processing

48.     Payroll and benefits are processed through a third-party servicer, Kelly Payroll located in Hunt Valley, Maryland.  Employees are paid every other Friday and all employees are on the same payroll cycle.  A few days before payday, the MD Homes payroll account is funded by the MD Homes operating account with enough money to cover payroll for the pay period.  Payroll data is then inputted using online software provided by Kelly Payroll.  After the data is inputted, Kelly Payroll transfers the necessary funds from the MD Homes payroll account to its account and processes payroll deposits and checks through its account.  Kelly Payroll charges a nominal fee of approximately $200 per pay period for this service.  To the extent the Debtors owe Kelly Payroll for accrued prepetition amounts, the Debtors seek authorization to pay any such nominal amounts to Kelly Payroll.

**Employee Benefits**

49.    In the ordinary course of business, the Debtors offer various plans and policies to provide employees with paid time off, as well as medical, dental, vision, life, long term disability and accidental death and dismemberment insurance (together, the "Employee Benefits").  Full-time employees and part-time employees who work at least 35 hours per week are eligible for Employee Benefits.

50.    The Debtors maintain an employee benefits policy pursuant to which employees are provided with certain sick time, paid holidays, and vacation pay.  Many employees have accrued paid time off as of the Petition Date, consistent with the Debtors' current policy for paid time off.

51.    The Debtors also offer medical, dental, and vision coverage to their employees. The Debtors pay 65% of the employee's health insurance coverage (through United Healthcare) and up to 50% of the deductible the employee is required to pay, if the employee chooses a "high deductible" plan, which requires the employee to pay $5,000.00 out-of-pocket before receiving benefits.  The estimated annual obligation to the Debtors for health plan premiums has been approximately $215,000.00, and the estimated annual obligation to the Debtors for the employer portion of the deductible under the "high deductible" plan has been approximately $12,000.00. The Debtors offer dental and other ancillary/supplemental types of coverage, although the employee is required to pay 100% of these premiums.

52.    The Debtors estimate that, as of the Petition Date, its outstanding obligations relating to Employee Benefits total $35,000.00.

**Reimbursable Business Expenses**

53.    In the ordinary course of business, the Debtors reimburse employees for actual, reasonable and proper business and travel expenditure incurred in the normal course of their

employment ("Reimbursable Expenses").  Employees typically incur Reimbursable Expenses

through the use of their or own cash.  As of the Petition Date, the Debtors estimate that unpaid

Reimbursable Expenses do not exceed $15,000.00.

54.      It is my belief that, to avoid the risk of such employee resignations and to

maintain employee morale, it is critical that the Debtors are authorized to pay the Employees

Obligations.  It is also essential that the Debtors continue the employee plans and policies

discussed above in the ordinary course of business and on an uninterrupted basis.

     **E.**     **Debtors' Motion for an Order (i) Authorizing Debtors to Continue Use of
Their Centralized Cash Management System, Existing Bank Accounts and
Business Forms, and (ii) Waiving Temporarily, the Deposit and Investment
<u>Requirements of Section 345 of the Bankruptcy Code</u>**

55.      By this Motion, the Debtors respectfully request the entry of an Order authorizing

the Debtors to continue using their existing cash management system, bank accounts and existing

business forms (each as defined below).

<u>**The Debtors' Cash Management System and Bank Accounts**</u>

56.      In the ordinary course of business, the Debtors maintain several bank accounts

(the "Bank Accounts") that operate as part of a cash management system (the "Cash

Management System").  Through the Bank Accounts, the Debtors collect, transfer, and disburse

funds generated from home sales.  The Debtors routinely deposit, withdraw, and otherwise

transfer funds to, from, and between the Bank Accounts by various methods including check and

wire transfer.

57.      The Debtors maintain all of their active accounts at Bank Annapolis, with the

exception of one account.  NC Homes maintains an escrow account at BB&T, in compliance

with North Carolina law, which requires an escrow account to be maintained in a bank that does

business in the state.

58.     The Debtors' escrow accounts (maintained by the construction entities, MD Homes and NC Homes) are used to hold customer deposits prior to settlements.  Prepetition customer deposits made with respect to Maryland and Delaware homes are held in an MD Homes escrow account, and postpetition customer deposits made with respect to Maryland and Delaware homes will be held in one of two new escrow accounts established to segregate deposits with respect to lots secured by Wells Fargo Bank, N.A. and M&T Bank, the Debtors' secured lenders.  All prepetition and postpetition customer deposits made with respect to North Carolina homes are held in the NC Homes escrow account, pending settlement.  Because Wells Fargo Bank, N.A. is the only secured lender with respect to North Carolina lots, the Debtors have not established escrow accounts to hold postpetition deposits for North Carolina homes.

59.     In addition to the escrow accounts, accounts held by the land owners to collect settlement funds and the MD Homes and NC Homes operating accounts described above, three (3) other accounts are maintained by the Debtors.  Specifically, MD Homes maintains a separate payroll account which is used to fund payroll a few days prior to payday, which occurs every other Friday.  MD Homes also maintains a "HUD Seeding" account, which is funded in the winter months when lawns cannot be seeded prior to settlements, to show the title and mortgage companies that the Debtors have the ability to complete seeding in the springtime.   NC Homes also maintains a petty cash account which is used to fund smaller expenses in North Carolina.  This account is funded periodically with nominal amounts by NC Homes' operating account.

### The Debtors' Business Forms

60.     In the ordinary course of business, the Debtors use a variety of business forms.  To minimize the expense to the estates and to avoid any confusion with suppliers, customers, and employees, the Debtors respectfully request that the Court authorize the Debtors to continue to use all business forms, including without limitation, checks, letterhead, customer program forms,

purchase orders, contracts, and invoices (collectively, the "Business Forms"), as such forms were

used by the Debtors immediately prior to the Petition Date, without reference to the Debtors'

status as debtors in possession.  Granting this relief will allow the Debtors to avoid the cost and

delay of ordering new business forms.  Upon depletion of the current stock of forms and checks,

the Debtors will obtain new checks and forms that indicate the debtor in possession status.

**Continued Use of a Cash Management System and**
**Continued Use of Business Forms Is Warranted**

61.     The Debtors' Cash Management System and Bank Accounts are established and

are significant aspects of the Debtors' ordinary course, essential business practices.  The

Debtors' Bank Accounts are part of a system that ensures the Debtors' ability to monitor and

control all of their cash receipts and disbursements efficiently.

62.     The Debtors' ability to manage collections and track receipts and disbursements

using their existing Bank Accounts and centralized Cash Management System is critical to their

operations and maximizing the value of the Debtors' bankruptcy estates.  During the pendency of

their bankruptcy cases, the Debtors intend to fund operations from existing cash and postpetition

revenues, all of which revenues will run through their Cash Management System.

63.     If the Debtors were required to close all existing Bank Accounts and terminate the

Cash Management System immediately, I believe that it would be extremely difficult and

expensive to establish the required multitude of new bank accounts promptly and a new cash

management system with sufficient sophistication to fulfill the Debtors' business needs.  I also

believe the disruption to the ordinary financial affairs of the Debtors would be prejudicial to the

Debtors' estates.

64.     In addition, the Debtors request that, as a way of minimizing expenses to their

estates, they be authorized to continue to use their correspondence and Business Forms

substantially in the form existing immediately before the Petition Date, without reference to their

status as debtors in possession.  The Debtors propose that, in the event they need to purchase

new Business Forms during the pendency of their chapter 11 cases, such forms will include a

legend referring to the Debtors' status as debtors in possession.

66.     It is my belief that, absence authorization to continue to use the Debtors' existing

Bank Accounts, Business Forms and Cash Management System in the ordinary course of

business, significant and unnecessary disruption to the Debtors' businesses will occur.

      **F.**    **Motion of the Debtors for an Order Directing Joint Administration of their
Related Chapter 11 Cases**

66.     Given the affiliation between the Debtors and the integration of the Debtors'

operations, joint administration of the chapter 11 cases will provide significant administrative

convenience without harming the substantive rights of any party in interest.  Many of the

motions, hearings, and orders that will arise in the chapter 11 cases will affect both Debtors.  The

entry of an Order approving joint administration will reduce fees and costs by avoiding

duplicative filings and objections.  Joint administration also will allow the Office of the United

States Trustee for the District of Maryland and all parties in interest to monitor the chapter 11

cases with greater ease and efficiency.

67.     Moreover, joint administration will not adversely affect the Debtors' respective

constituencies because the motion requests only administrative, not substantive, consolidation of

the estates. Thus parties in interest will not be harmed by the relief requested, but instead will

benefit from the cost reductions associated with the joint administration of the chapter 11 cases.

Accordingly, the Debtors submit that the joint administration of the chapter 11 cases is in the

best interests of the Debtors' estates, their creditors, and all other parties in interest.

**G.    Debtors' Motion for an Order Extending the Time to File Schedules of Assets and Liabilities and Statement of Financial Affairs**

68.    Pursuant to Bankruptcy Rule 1007(c), the Debtors' Schedules and SOFA must be filed with their voluntary petitions, or within fourteen (14) days after the Petition Date if the petitions are accompanied by a Creditor List.

69.    Here, the Debtors have approximately 200 to 250 creditors.  The conduct and operation of the Debtors' businesses require the Debtors to maintain extensive books and records.  As a result of the size and complexity of their business operations, as well as the demand on the Debtors to communicate and work with their lenders and contract purchasers to ensure a smooth transition in the initial stages of the chapter 11 cases, the Debtors and their professionals have yet to complete the Schedules and SOFA, and anticipate that such documents cannot reasonably be completed by the deadline established by Bankruptcy Rule 1007(c).  Rather than filing incomplete documents that would require amendments at a later date, the Debtors seek an extension of time to complete this task.

70.    The Debtors believe cause exists to grant the Debtors a sixty (60) day extension of the fourteen-day deadline provided by Bankruptcy Rule 1007(c), which will provide the Debtors with a total of seventy-four (74) days after the Petition Date to file the Schedules and SOFA.

71.    The complexity of the Debtors' organization, the substantial amount of information that the Debtors must assemble and compile, and the number of employee and professional hours required to complete the Schedules and SOFA while managing the operations of the Debtors' ongoing business, all constitute good and sufficient cause for granting the requested extension of time.

**H.    Debtors' Motion for Order Authorizing Debtors to File Consolidated Mailing Matrix and Consolidated List of 30 Largest Unsecured Creditors**

72.    There are seven (7) affiliated Debtors and between 200 and 250 creditors and other parties in interest in these cases.  Given the potential confusion and overlap regarding creditor obligations, combined with the fact that the Debtors are related affiliates, the Debtors submit that it is appropriate for them to file a consolidated mailing matrix and consolidated list of their 30 largest unsecured creditors.  The consolidated mailing matrix and the consolidated list of creditors will provide good and sufficient notice to all creditors and parties in interest in an efficient manner.

### III.    Conclusion

73.    Approval of the First-Day Motions filed by the Companies is crucial to the Companies' ability to continue their businesses.  Without the relief requested, the Companies will be forced to cease operations, and would be unable to complete construction of, and to deliver, homes to their customers who are counting on being able to close on the purchase of their new homes.  The requested relief also will assist the Debtors in maintaining employee morale and establishing certain other administrative procedures to promote a smooth transition into chapter 11.

Dated:  September 3, 2010

/s/ James W. Thomasson, Jr.
James W. Thomasson, Jr.